IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JUNE F. HARRIS, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. RDB-16-0812 |
| ANNE ARUNDEL COUNTY MARYLAND, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff June F. Harris ("Plaintiff" or "Harris"), an African-American female, brings this action alleging race discrimination against Anne Arundel County, Maryland ("Defendant" or the "County") in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, stemming from her non-selection for the position of Assistant Correctional Facility Administrator at the Ordnance Road Correction Center. Currently pending before this Court is the Defendant's Motion for Summary Judgment. (ECF No. 34.) The parties' submissions have been reviewed, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2016). For the reasons stated below, Defendant's Motion for Summary Judgment (ECF No. 34) is GRANTED and Judgment is ENTERED in favor of Anne Arundel County, Maryland.

### BACKGROUND

In November of 2016, this Court dismissed Harris' retaliation claim against the County, as well as any claims against William Martin. The Plaintiff was permitted a discovery

1

period to proceed with a single claim against the County for racial discrimination. After a lengthy period of discovery, it is clear to this Court that there are no genuine issues of material fact such that a reasonable jury could award a verdict for Harris.

This Court begins with an overview of the Anne Arundel County Detention Center (the "Detention Center"). The Detention Center consists of two facilities: the Jennifer Road Detention Center ("JRDC"), a maximum security facility that primarily houses individuals awaiting trial, and the Ordnance Road Correctional Center ("ORCC"), a minimum security facility that primarily houses individuals with prison sentences of less than eighteen months. Since 2009, the superintendent of both facilities has been Terry Kokolis. (Kokolis Tr., ECF No. 34-6 at 2.) At each detention center there is a Correctional Facility Administrator ("CFA") who reports to the superintendent. (Martin Tr., ECF No. 34-5 at 40.) During the relevant time period, the CFA at JRDC was Brenda Shell-Eleazer, an African-American female, and the CFA at ORCC was William Martin, a Caucasian male. (*Id.*) Underneath the CFAs are Assistant Correctional Facility Administrators ("ACFAs"). (*Id.* at 41.) There are three ACFAs at the Detention Center: two at JRDC and one at ORCC. (*Id.*)

There are two other pertinent categories of positions at the Detention Center. First, there are Detention Officers that maintain security at the facilities and who report to Detention Captains. The Detention Captains then report to the ACFAs at their facilities. If the CFAs and ACFAs are absent, for example they generally do not work over the weekends, the Detention Captains are responsible for the overall operations of the facility. (ECF No. 34-5 at 38-39.) Second, there are Correctional Program Specialists who determine to which programs inmates should be referred and who then act as liaisons between the

2

Detention Center and individuals from those programs. (*Id.* at 17-19.) The Correctional Program Specialists are supervised by Criminal Justice Program Supervisors.

In 1988, Plaintiff Harris began working as a Detention Officer at JRDC. (Harris Dep., ECF No. 34-4 at 8-9.) In 1993, she was promoted to Correctional Program Specialist. (*Id.* at 10.) Ten years later in November of 2004, she was promoted to her current position of Criminal Justice Program Supervisor at the other detention facility, ORCC. (*Id.* at 13; ECF No. 38-1 at 2.) As a Criminal Justice Program Supervisor, Plaintiff testified that she supervised staff, had various managerial duties, and orchestrated different programs or areas depending on which ORCC facility she was assigned.[1] (ECF No. 34-4 at 28-34.)

On January 23, 2013, Anne Arundel County posted a job opening for an Assistant Correctional Facility Administrator ("ACFA") position.[2] (Martin Aff., ECF No. 34-9 at ¶ 4; ECF No. 34-8 at 25.) The posting indicated that the position consisted of "highly responsible penological management work in assisting and directing the operations of the County's Correctional Facilities." (*Id.*) The posting listed various examples of the positions' duties, relevant knowledge, skills, and abilities, and minimum qualifications for the position. (*Id.* at 25-27.) The posting also indicated that supplemental qualifications for the position were (i) "four or more years of administrative experience in correctional facility functions to include security, inmate services or community services" and (ii) "four or more years of

---

[1] For instance, Plaintiff testified that when she was assigned to the "Echo building" she was responsible for ensuring that the recreational area was running properly while at the "Delta building" she was responsible for the educational program. (ECF No. 34-4 at 28-32.)

[2] Plaintiff asserts that "[i]mportantly, the vacant ACFA position was at ORCC and not JRDC." (ECF No. 38-1 at 6.) Plaintiff appears to gleam this from the fact that the position became vacant when an ACFA from ORCC left the Detention Center. (ECF No. 40-4 at 4.) However, the posting for the position did not indicate that the ACFA position was specifically for JRDC or ORCC. (ECF No. 34-8 at 25.) Rather, Shell-Eleazer testified that the "vacancy was for the Department." (ECF No. 40-4 at 3.)

3

Supervisory experience." (*Id.*)

Angela McLaughlin, the Personnel Analyst in the Office of Personnel for the County, received seventy eight applications for the position. (McLaughlin Aff., ECF No. 34-8 at ¶ 12.) She then chose eleven candidates, including Harris, who met the minimum and supplemental qualifications for the position. (*Id.*) Of those eleven individuals, nine were interviewed.[3] Two of the nine individuals were internal to the Detention Center: Plaintiff Harris and Michael Borgese. Harris' application detailed her experience described above, from a Detention Officer through her current role as Criminal Justice Program Supervisor. (ECF No. 34-9 at 16-18.) She stated that in her current position, she supervised twenty-five individuals. (*Id.* at 16.) On the other hand, Michael Borgese was a Detention Captain who began working for Anne Arundel County Detention Center in 1994. (ECF No. 36-1 at 29-32) (sealed). From 1994 through the date he applied for the ACFA position, he worked as a Correctional Officer, Detention Officer, Detention Sergeant, Detention Lieutenant, and finally a Detention Captain. (*Id.*) At the time he applied, he had been a Detention Captain for over four years at the time and stated that he supervised ninety-three individuals. (*Id.*)

Martin testified that prior to the interviews, Borgese approached him and asked if he could give any insight into the content of the interviews for the ACFA position. (Martin Dep., ECF No. 34-5 at 71-72.) At that time, Martin did not know that he would ultimately be on the interview panel. (*Id.* at 74.) In response, Martin told Borgese that he "anticipated that the interview, itself, would be global in nature, and that the job had been advertised internal and external. If the interview was specific to just our department, that it may be

---

[3] The other two individuals dropped out of the process. (ECF No. 34-8 at ¶ 13.)

viewed as being unfair to an external candidate, who might not know our department." (*Id.* at 71-72.) A few days later, Borgese approached Martin again and said he would like to ask him questions about program classification files. (*Id.* at 73.) Martin then took Borgese to an administrative conference room to discuss his questions. (*Id.*) During this meeting with Borgese, which Martin testified lasted no longer than fifteen minutes, Harris walked by and saw "several program files" spread out on a table between Martin and Borgese. (*Id.* at 74; ECF No. 34-4 at 44, 50.)

Given Harris' background at the Detention Center, she was already familiar with program classification files. (ECF No. 34-4 at 55.) Accordingly, she testified that she never asked Martin to discuss such files prior to her interview. (*Id.*) Rather, she asked Martin if there was anything she "could read up on or brush up on to prepare [her]self for [her] upcoming interview." (ECF No. 34-4 at 45.) In response, Harris testified that Martin told her "no, the questions [are] not going to be tailored toward the position because we ha[ve] people coming from the outside, as well as the inside, and you either know it or you don't." (*Id.* at 56.) Martin testified that he responded to Harris in the same way in which he responded to Borgese, indicating that the questions would be more global in nature and that Harris was free to contact him with any further questions. (ECF No. 34-5 at 78-79.)

A few days before the interviews, Martin and Brenda Shell-Eleazer, the Assistant Correctional Facility Administrators for the Jennifer Road Detention Center and Ordnance Road Correctional Center, were chosen to be the interview panel. (Koklis Dep., ECF No. 34-6 at 15; Martin Dep., ECF No. 34-5 at 76.) The personnel liaison for the Department of Detention Facilities, Sarita Durant, prepared the interview questions. (ECF No. 34-8 at ¶¶

13-14.) On the morning of the first interview, Martin and Shell-Eleazer received the individuals' applications, resumes, other materials they submitted, and an "Interview Report" that listed the interview questions and contained space for notation. (ECF No. 34-9 at ¶ 6.)

The interviews took place on April 4 and 5, 2013. Plaintiff testified that during the interview, she was not asked questions "pertaining to the specifics of the job" including "the programs of the facility." (ECF No. 34-4 at 37.) Rather, she only recalled describing herself and being asked to describe her leadership skills. (*Id.* at 38.) The Interview Reports for each applicant show that the applicants were asked eight questions including "briefly articulate your work history," "what do you consider to be the most important issue(s) facing corrections management today," "please describe your personal Philosophy of Management," and describe how you would learn the requisite skills to manage both security and civilian supervisors. (ECF No. 34-9 at 13-15.) For each question, Martin and Shell-Eleazer indicated whether the applicant's answer made the individual "Unqualified" for the position, worth zero points, "Qualified," worth one point, "Better Qualified," worth two points, or "Best Qualified," worth three points. (*Id.*) At the bottom of the Interview Report, Martin and Shell-Eleazer combined the applicant's score for each question to determine a Final Overall Rating. (*Id.*)

According to the Interview Reports, Martin and Shell-Eleazer ranked Plaintiff Harris sixth out of the nine candidates.[4] (ECF No. 34-9 at ¶ 9; ECF No. 42-1 (sealed)). Three of the candidates had an average Final Overall Ranking[5] of 7 as Qualified. (ECF No. 42-1) (sealed).

---

[4] In contrast, the Amended Complaint had alleged that "Ms. Harris finished second out of approximately one hundred candidates." (ECF No. 6 at ¶ 45.) There is absolutely no factual basis in the record for this assertion.
[5] By "average," this Court refers to the average of Martin and Shell-Eleazor's independent Final Overall

6

Harris then had the fourth lowest Final Overall Ranking of 8.5 as Qualified. (ECF No. 34-9 at 13-15, 21-23.) The next four candidates had average Final Overall Rankings between 9.5 and 11.5 as Qualified or Better Qualified. (ECF No. 42-1) (sealed). Finally, Borgese scored the highest with an average Final Overall Ranking of 21 as Best Qualified. (*Id.*) Martin and Shell-Eleazer accordingly recommended Borgese to Superintendent Kokolis. (Kokolis Tr., ECF No. 34-6 at 6-8.)

Superintendent Kokolis accepted the recommendation, and on April 16, 2013, announced that Borgese had been chosen to be promoted to ACFA and would be assigned to JRDC. (Martin Tr., ECF No. 40-2 at 9-10; ECF No. 34-14.) As a result, an ACFA from JRDC was reassigned to ORCC. (Martin Tr., ECF No. 40-2 at 9-10; ECF No. 34-14.) Harris testified that when she heard Borgese was offered the position, it "was not a surprise." (ECF No. 34-4 at 41-43.) She asserts that this was because employees at the Detention Center "all underst[ood] the good old boy network" and had seen Martin meeting with Borgese prior to his interview. (*Id.* at 43-44.)

In September of 2014, the County posted another notice that an ACFA position was available. (ECF No. 34-4 at 59.) Harris applied again, and was again selected for an interview. (*Id.* at 64.) This time, there was a three-person interview panel consisting of Martin, Shell-Eleazer, and another individual who was an African-American male.[6] (*Id.*) After the interview process, Harris was again not selected for the position of ACFA. Rather, another African-American female who was an internal candidate was selected. (*Id.* at 65-66.) A year later in 2015, another ACFA position became available. After another competitive selection process,

---

Rankings for each candidate.
[6] Plaintiff Harris did not remember the third individual's name. (ECF No. 34-4 at 64.)

7

an African-American female was selected for the position. (*Id.* at 68.)

Plaintiff filed a Complaint with the U.S. Equal Employment Opportunity Commission, which on December 23, 2015 notified her that it was unable to conclude that the County had violated Title VII and issued her a Notice of Right to Sue. (ECF No. 1-4.) On March 18, 2016, Plaintiff filed a four-count Complaint in this Court against William Martin, Anne Arundel County Detention Center, and Anne Arundel County, Maryland, alleging race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.* (ECF No. 1.) Plaintiff then filed an Amended Complaint omitting the Detention Center as a defendant. (ECF No. 6.) Subsequently, Martin filed a motion to dismiss all of the claims against him and the County filed a motion to dismiss Plaintiff's retaliation claim as set forth in Count II. (ECF Nos. 7, 9.) On November 2, 2016, this Court granted both motions, dismissing as a matter of law all of Plaintiff's claims against Martin and Plaintiff's retaliation claim against the County. (ECF Nos. 15, 16.) Accordingly, Plaintiff proceeded with the single claim that the County discriminated against her on the basis of her race in violation of Title VII. (ECF Nos. 15-16.) Following discovery, the County filed the instant Motion for Summary Judgment. (ECF No. 34.)

**STANDARD OF REVIEW**

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. While the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), a court must consider the facts and all reasonable inferences in the light most favorable to the non-moving party. *Judd*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007).

## ANALYSIS

Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.* makes it unlawful "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . .." § 2000e-2(a)(1). A plaintiff may establish discriminatory intent either through direct evidence of discriminatory animus or through the "pretext" framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). Under the "pretext" framework, the burden is first on the plaintiff to make a *prima facie* case of discrimination. If the plaintiff makes this showing, the second step places the burden on the employer to assert a "legitimate, non-discriminatory reason" for the disparate treatment. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If the employer meets this step, the burden then shifts back to the plaintiff to demonstrate that the employer's purported reason was "pretextual." As this Court stated in *Venugopal v. Shire Labs.*, 334 F. Supp. 2d 835 (D. Md. 2004), *aff'd sub nom*, 134 F. App'x 627 (4th Cir. 2005), "[w]hile the *McDonnell Douglas* framework involves a shifting back and forth of the evidentiary burden, Plaintiff, at all times, retains the ultimate burden of

persuading the trier of fact that the employer discriminated in violation of Title VII." 334 F. Supp. 2d at 841.

In order to make a *prima facie* claim for failure to promote, a plaintiff must show that he or she (1) is a member of a protected class, (2) applied for the position, (3) was qualified for that position, and (4) was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 319 n. 6 (4th Cir. 2005). While the County does not dispute that Harris is a member of a protected class who was qualified and applied for the ACFA position, the County argues that she has not shown that Borgese was chosen for the position under circumstances giving rise to an inference of unlawful discrimination.[7] As explained below, regardless of whether Harris has established a *prima facie* case, the record shows that the County has articulated a legitimate, non-discriminatory reason for choosing to promote Borgese that Harris has not shown is pretext for discrimination.

When evaluating whether an employer has articulated a legitimate, non-discriminatory reason for disparate treatment, "this Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." *DeJarnette v. Corning, Inc.,* 133 F.3d 293, 298-299 (4th Cir. 1998); *Staley v. Guenberg*, No. 13-1875, 575 Fed. App'x. 153, 156 (4th Cir. June 6, 2014). Thus, "'when an employer articulates a reason for [its treatment of the plaintiff]' that the statute

---

[7] The Defendant argues that Plaintiff has not shown a *prima facie* case of discrimination because although the 2013 ACFA position was filled with a Caucasian male, the 2014 and 2015 ACFA positions were filled with similarly situated, African-American females. Plaintiff responds that the County cannot rely on subsequent promotions to defeat an inference of unlawful discrimination in 2013. As explained below, this dispute is of no moment given that Plaintiff cannot show the Defendant's legitimate, non-discriminatory reason for promoting Borgese was pretext for discrimination.

10

does not proscribe, 'it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the [employment decision]." *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 901 (4th Cir. 2017) (quoting *DeJarnette*, 133 F.3d at 299).

Plaintiff Harris argues that "Defendant's legitimate, non-discriminatory reasons for Plaintiff's non-promotion, to the extent there were any, are mere pretext." (ECF No.38-1 at 18.) First, the County has shown a legitimate, non-discriminatory reason for promoting Borgese. The two CFAs at the Detention Center—Brenda Shell-Eleazer, an African-American female, and William Martin, a Caucasian male—interviewed nine candidates whom the Center's Personnel Analyst chose as qualified to interview for the ACFA position. Shell-Eleazer and Martin asked each candidate the same eight questions, and scored the applicants based on their answers. Harris ranked sixth out of the nine candidates, while Borgese ranked first. Shell-Eleazer and Martin's ranking of Borgese reflected his experience at the Detention Center where he had worked since 1994, and specifically his four years of experience as a Detention Captain. During those four years, he supervised ninety-three individuals and, as Martin testified, reported to the ACFA at his facility. When the CFAs and ACFAs were not present at the facilities, for example on the weekends, he was responsible for the overall operations of the facility. Therefore, the County has clearly articulated a legitimate, non-discriminatory reason for selecting Borgese.

Second, the record also shows that the County's reason for promoting Borgese over Harris was not pretext for discrimination. The final step in the *McDonnell Douglas* framework shifts the burden back to Plaintiff to demonstrate that the County's purported reason for not

11

promoting her was "pretextual." *McDonnell Douglas*, 411 U.S. at 804, 93 S. Ct. 1817. To meet this burden, a plaintiff must show "both that the reason was false, and that discrimination was the real reason" for the disparate treatment. *Adams v. Tr. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (emphasis omitted). "A plaintiff alleging a failure to promote can prove pretext by showing that [she] was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons." *Heiko v. Colombo Savings Bank, F.S.B.,* 434 F.3d 249, 259 (4th Cir. 2006); *Christian v. South Carolina Dept. of Labor Licensing and Regulation*, No. 14-2168, 651 Fed. App'x. 158, 165 (4th Cir. June 1, 2016).

Harris asserts various arguments that the County's reasons for promoting Borgese were pretext for discrimination. All of these arguments are without merit. At the outset, this Court notes that Plaintiff points to no evidence in the record of any racial animus. Rather, of the two-person interview panel for the ACFA position, Shell-Eleazer was also African-American and Plaintiff testified that she and Martin "always had a very professional, positive professional rapport." (ECF No. 34-4 at 69.) Without circumstantial evidence of discrimination, Plaintiff argues that she has shown pretext because she was more qualified than Borgese for the ACFA position. She emphasizes that she had experience working with various programs in the Detention Center through her role as a Criminal Justice Program Supervisor, while Borgese's work history was focused on security and detention. When using this method to show pretext, however, the United States Court of Appeals for the Fourth Circuit has explained that if "a plaintiff asserts job qualifications that are similar or only slightly superior to those of the person eventually selected, the promotion decision remains

12

vested in the sound business judgment of the employer." *Heiko*, 434 F.3d at 261; *see also Moore v. Mukasey*, No. 07-1513, 305 Fed. App'x. 111, 116 (4th Cir. Dec. 30, 2008) ("Under our case law, a Title VII plaintiff cannot rely on his qualifications to establish pretext if he asserts that his qualifications are similar or only slightly superior to those of the person ultimately selected for promotion.").[8]

As explained above, the Personnel Analyst in the Office of Personnel for the County first determined that both Borgese and Harris, even with their different backgrounds, met the minimum and supplemental qualifications for the ACFA position and deserved interviews. (ECF No. 34-8 at ¶ 12.) Subsequently, Borgese scored significantly higher than Harris during the interview. Accordingly, at most Plaintiff may claim that she was similarly qualified for the position, and under those circumstances "the promotion decision remains vested in the sound business judgment of the [County]." *Heiko*, 434 F.3d at 261.

Relatedly, Plaintiff asserts that "Martin and Anne Arundel coached [Borgese] on how to do the job so they could give the appearance that Borgese obtaining the position was legitimate." (ECF No. 38-1 at 18.) Harris refers to the fifteen minute meeting between Martin and Borgese whereby Borgese asked Martin about reading program classification files. Harris asserts that she "was not afforded even remotely the same amount of opportunity that Borgese was given." It is undisputed, however, that Plaintiff already knew how to read these files and had an equal opportunity to speak with Martin. *See* ECF No. 38-1 at 8 ("Defendant states that both Plaintiff and Borgese were able to speak with Martin . . .

---

[8] *See also Olumoya v. Prince George's County Public Schools*, No. PJM-08-1769, 2010 WL 2696625, at *3 (D. Md. July 2, 2010) (citing *Heiko* for the proposition that a "plaintiff must show that she is 'demonstrably superior' to the other selected candidates"); *Louis v. City of Rockville*, No. CV PX-16-1471, 2018 WL 1471681, at *6 (D. Md. Mar. 23, 2018) (explaining that a plaintiff could show pretext if he or she demonstrated that they were "discernibly better qualified" than the candidate who received the promotion).

[which] is technically true."). When she asked Martin about the interview, Martin told her the same thing he told Borgese: the interview questions would not be tailored to the Detention Center because there were both internal and external candidates. Rather, they would be more "global in nature." The Interview Reports then show that the questions in fact related to leadership and management skills.[9] Therefore, there is no evidence that Martin's meeting with Borgese tainted the interview and selection process or undermines the County's legitimate, non-discriminatory reason for choosing Borgese for the position.

Finally, Plaintiff claims that the ORCC was the "preferred facility" and alleges that the County had a plan whereby when "Borgese obtained the position, management knew he was not qualified for the position, so they immediately transferred him to a security job at JRDC which, neither he nor Plaintiff applied for, and [then Tom] Laue, a Caucasian, was brought to ORCC from JRDC to fill the vacancy." (ECF No. 38-1 at 18.) It is undisputed, however, that the posting for the ACFA position did not indicate whether the successful applicant would be assigned to the Jennifer Road Detention Center or the Ordnance Road Correctional Center. Rather, Shell-Eleazer testified that the "vacancy was for the Department." (ECF No. 40-4 at 3.) Superintendent Kokolis then ultimately decided that Borgese would be assigned—as an ACFA—to JRDC. Accordingly, Plaintiff has not produced any circumstantial evidence that undermines the credibility of the County's legitimate, non-discriminatory reasons for not promoting Harris. Therefore, Plaintiff has not

---

[9] To the extent Plaintiff asserts that "[t]he global nature of the procedure allowed for a more subjective analysis of the candidates' skills," (ECF No. 38-1 at 3), this Court has held that the fact that an interview process is "subjective" does not mean it is unlawfully discriminatory. *See Langerman v. Thompson*, 155 F. Supp. 2d 490, 500 (D. Md. 2001) ("To be sure, the interview process involved subjectivity, as it largely consisted of choosing candidates based on the QRB's perception of how well they answered questions. However, the fact that the QRB's interview process was "subjective" or even "haphazard" does not mean it was unlawfully discriminatory.").

carried her burden under the *McDonnell Douglas* framework and Defendant's Motion for Summary Judgment is GRANTED.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment (ECF No. 34) is GRANTED and Judgment is ENTERED in favor of Anne Arundel County, Maryland.

A separate order follows.

Dated: August 24, 2018

                                                   /s/

                                                   Richard D. Bennett
                                                 United States District Judge